IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
      v.                        )        1:10CV198
                                )
JERRY B. CLAYTON, DEBORAH P.    )
CLAYTON, ALLENE S. CLAYTON,     )
EDWIN L. CLAYTON, MARIA D.      )
CLAYTON, KEN A. CLAYTON, and    )
GAIL A. CLAYTON,                )
                                )
            Defendants.         )


## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This is a tax case in which the United States of America (or "Government") seeks recovery of alleged unpaid taxes and penalties. Before the court is the motion of Defendant Jerry B. Clayton ("Clayton") for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 51.) Clayton contends that a general discharge from his previous bankruptcy proceedings protects him from the Government's attempt to pursue its claims and, alternatively, the Government has failed to muster sufficient evidence to support them. The court heard oral argument on the motion on January 6, 2012. For the reasons set forth below, the court finds there are genuine disputes as to

material facts that warrant trial, and Clayton's motion will be denied.

I. **BACKGROUND**

The record evidence, taken in the light most favorable to the Government as the non-moving party, reveals the following:

At all times relevant, Clayton was a successful criminal defense attorney practicing in North Carolina. He and his second wife, Defendant Deborah P. Clayton ("Deborah"), timely filed joint income tax returns for tax years 2002 through 2007 that reported significant income from his practice, which Clayton operated as a sole proprietorship:

| Year | Net Business Income |
|------|---------------------|
| 2002 | $798,129 |
| 2003 | $780,663 |
| 2004 | $530,662 |
| 2005 | $769,269 |
| 2006 | $807,674 |
| 2007 | $1,200,000 |
| TOTAL | $4,886,397 |

(Doc. 51-3 at 117; Doc. 55-5; Doc. 55-6.)[1] However, for these years, the Claytons paid only a fraction of the federal income tax they owed. For the years in question, the Claytons' federal

---

[1] Clayton was specifically asked about, and admitted, to his signatures on his tax returns for years 2003, and 2005 through 2007. (Doc. 51-3, at 23, 88-89, 95-96, 108, 111, 114, 142.) There is no dispute he filed the returns timely.

tax liability totaled approximately $1.6 million before interest and penalties, and the Internal Revenue Service ("IRS") has subsequently levied a bill against them for all unpaid income taxes.[2] (Doc. 51-3 at 24.)

On March 11, 2010, the Government initiated this action against Clayton and other members of his family to reduce Clayton's tax liability for tax years 2002 through 2007 to judgment (Count I) and to foreclose on property owned jointly by Clayton, his brothers, and their spouses to satisfy a tax lien undergirded by the tax liability in Count I (mislabeled as "Count III"). (Doc. 1.) Before filing an answer, and faced with these and other debts (that Clayton argues were related to his wife's health and their children's education expenses), Clayton filed for Chapter 7 bankruptcy protection on May 22, 2010. (Doc. 13; Doc 44 at 2.) Clayton's bankruptcy filing automatically stayed this action. See 11 U.S.C. § 362. In the bankruptcy proceedings, Clayton listed the United States as a creditor, but neither Clayton nor the Government sought a determination from the bankruptcy court whether or not his tax liabilities were nondischargeable in bankruptcy based on any statutory exception. On September 2, 2010, the bankruptcy court entered a general discharge of Clayton's debts. Discharge of

---

[2] Clayton and his wife have separated, and the court entered a default judgment against Deborah on September 1, 2010. (Doc. 22.)

Debtor at 1, <u>In re Clayton</u>, No. 10-80899 (Bankr. M.D.N.C. Sept. 2, 2010), Doc. 31.

As Clayton's bankruptcy drew to a close, the United States moved to reopen this action (Doc. 19), which the court did on September 27, 2010 (Doc. 28). On October 15, 2010, Clayton answered the Government's complaint and raised several defenses, including claims that "[s]ome or all of [his] debt(s)" had been discharged in bankruptcy, that "[s]ome or all of the income tax liability" had been paid, and that the Government's claims for equitable relief were barred by the doctrines of waiver, estoppel, and unclean hands. (Doc. 30.)

On July 29, 2011, Clayton filed a motion for judgment on the pleadings. (Doc. 43.) In a memorandum opinion entered December 13, 2011, the court conditionally denied Clayton's motion upon the Government's amendment of its complaint to include allegations of the willful evasion theory upon which it was intending to proceed, and as to which it had given all parties notice in the Rule 26(f) report over one year earlier and upon which discovery had already been conducted. <u>United States v. Clayton</u>, No. 10CV198, 2011 WL 6180033 (M.D.N.C. Dec. 13, 2011). The parties have subsequently filed amended pleadings in compliance with the court's ruling,[3] and the court

---

[3] Clayton has moved the court to reconsider its ruling denying his motion for judgment on the pleadings. (Doc. 67.) The court has

treats Clayton's present motion for summary judgment as directed to the claims in the amended complaint.

Clayton contends that he was a "poor businessman," focused on his law practice, and left all financial matters to his wife/business manager, Deborah, to whom he also delegated responsibility for complying with his tax obligations. (Doc. 51-3 at 68, 80-82.) He also says he only "skimmed" his tax returns and denies he was aware of his specific tax liabilities. (Id. at 88-89.) Beginning in 2000, Clayton contends, he came upon hard times because of medical issues related to his daughter and, subsequently (at some unspecified time), his wife when they suffered, among other things, significant mental health issues requiring expensive intervention. He points to $98,000 in medical expenses incurred in 2002 (id. at 68) and the "heavy financial demands" of college educations for several of his four children (Doc. 52 at 3). According to Clayton, his wife's initially undetected deterioration of mental health, in conjunction with her coordination of unusually large distributions from their retirement fund, caused them to fall behind in their tax payments. (Id.) This was compounded, he claims, by several loans he made to his law practice. (Id.) When questioned about specific items, however, Clayton claimed

concluded that no change in the ruling is warranted. (Doc. 78.) For that reason, any arguments in his summary judgment briefing raising the same legal arguments are rejected for the same reasons previously noted by the court.

he was afflicted with several bouts of "trans-global amnesia," which prevent him from recalling much information. (Doc. 51-3 at 8-13.) (He makes this claim even though he still actively practiced law at the time of his September 2011 deposition. (Id. at 19.))

The Government, on the other hand, has provided evidence that Clayton engaged in an extravagant lifestyle and made payments for non-necessities while being aware that he and his wife were increasingly falling behind in their federal tax obligations. Initially, the Government points to his $10,000 monthly mortgage on his $2.2 million home (id. at 30, 93), complete with swimming pool and collection of exotic animals, including zebras, leopards, monkeys, and horses; the Claytons' monthly electric bill alone was $2,000 (id. at 33-37, 59-62).

In addition, throughout 2002 through 2007, Clayton voluntarily paid $1,500 a month ($18,000 annually) to his ex-wife, even though he had no legal obligation to do so.[4] (Id. at 39-40.) He also made significant payments for his children's college and graduate school education. Though Clayton claimed he did not know precisely when his children attended college, the likely years can be extrapolated from the testimony he gave.

---

[4] Clayton contended at oral argument that these payments were for his ex-wife's medical expenses. Clayton's deposition does not support this. (Doc. 51-2 at 39.) Even if it did, it would be immaterial because the point is that, while well-intentioned, the payments were not legally required.

Thus, for one daughter, he paid for six or seven years of college tuition and living expenses extending through 2002 (and perhaps 2003). (Id. at 45-46 (noting he paid "everything").) For a son, Clayton paid tuition and all living expenses for education at Barton College, a private institution, during 2002 through 2005; the annual tuition was approximately $26,000 to $28,000 (less $1,800 in state stipend and an honors scholarship of $2,250). (Id. at 49-53.) Thereafter, Clayton paid the son's tuition and living expenses for a Masters degree program at Duke University, another private institution, during approximately 2005 through 2006. (Id. at 52-53.) Clayton then paid two more years of living expenses (likely 2006 through 2007) for that grown son's enrollment in a Ph.D. program at the University of Minnesota. (Id. at 55.) Finally, another daughter attended four years of college at Greensboro College, a private institution, likely from 2004 through 2008, during which Clayton paid her tuition, ranging from $26,000 to $30,000 annually, and all expenses. (Id. at 56-58.)

Clayton also regularly made payments of $300 a week to his church, which would total approximately $15,600 a year, although at some later point he reduced the payments to $100 a week (or, $5,200 a year). (Id. at 150-51.) Clayton's tax return for 2003 also lists $52,000 in "gifts to charities." (Id. at 97-98.) Moreover, Clayton purchased several new or late model vehicles

during these tax years:  a 2003 Mercedes-Benz for his 16 year-old daughter in 2002, a 2003 Dodge Ram truck purchased in 2003 for himself, and a 2006 Dodge Charger bought in 2005 for himself.  (Id. at 128; Doc. 55-4 at 4.)  The Government has also provided copies of fifteen months of statements from American Express for the Claytons' credit card purchases during 2003 and 2004.[5]  These alone reflect significant charges for discretionary expenditures, including:  $1,000 to Royal Caribbean Cruise Line; $9,681 to a Nix Collectibles store; $7,814 at JR Tobacco; $1,987 to the Durham Bulls; over $16,000 on clothing stores; and monthly bills for satellite Direct TV, veterinary services, and monthly charges for a private dining club (the "University Club").  (Docs. 57-1 through 57-7.)

The Government also points to significant cash withdrawals from Clayton's IRA.  Clayton's Form 1099-R for 2002 shows a

---

[5]  At oral argument, Clayton objected to the authenticity of these statements, but had not done so in his prior brief.  Apart from Clayton's having waived the objection, the court finds that the records are properly before the court for consideration.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Clayton also contended at oral argument that his American Express statements indicate that his wife made the bulk of the couple's purchases, for which Clayton should not be legally responsible for purposes of a determination of willful evasion.  A review of the statements, covering a scattered selection of fifteen months between January 2003 and October 2004, show that the invoices were addressed to Clayton at his law office.  They also indicate that he and his wife spent approximately $17,271 per month on their American Express cards; the purchases attributable to Clayton's personal card averaged $11,190.33 monthly, while purchases on his wife's card averaged $6,083.00 monthly.  While certain purchases on both cards are plainly attributable to Clayton's law practice, the $5,000 disparity between Clayton's charges and his wife's fails to support Clayton's position that his wife spent the bulk of the couple's money.

withdrawal of $241,000, with $48,000 being withheld for tax liability; while his 2004 return shows a withdrawal of $475,000. Clayton claims he does not know why these huge withdrawals were made. (Doc. 51-3 at 87-88, 91, 104-07.) Clayton did admit that his wife was apparently supporting a private school she founded – Greenbrier Academy – because, as Clayton put it, "tuition will not pay for a private school on its own." (Id. at 75.) However, on this record the Government has not linked any of these withdrawals, or any disbursement at all, to a payment supporting the Greenbrier Academy.

As to Clayton's claims that he spent his money on medical expenses, the Government points out that his tax returns show $98,000 in medical expenses in 2002, $12,535 in 2003, $57,000 in 2004, and $0 in 2005, 2006, and 2007. (Id. at 95-97, 104-07, 109, 112, and 116.) Thus, Clayton's total documented medical expenses for the tax years at issue were $167,535, while his total net business income was more than $4.8 million.

The Government also notes that Clayton admitted that throughout this entire period he was aware of his duty to file returns and to pay taxes. (Id. at 142.) Clayton further conceded that he knew he was not making his tax payments:

> Q   At the time you filed your tax returns for 2002 through 2007, did you know that you hadn't fully paid your federal income taxes?
>
> A   Yes, ma'am.

(Id.) He even "got on" his wife Deborah about paying the quarterly estimates due the Government. (Id. at 82, 83, 142.) At one point in his deposition, Clayton said he decreased his personal expenses in response to the outstanding liabilities, reflecting an awareness of his liability and nonpayment. (Id. at 92.) In other testimony, however, Clayton admitted that he "didn't want to be bothered by all this stuff, frankly," "didn't pay attention to my business, let my wife do it," but "thought everything was being taken care of." (Id. at 91, 121, 144.) As to his involvement, he offered contradictory statements that his taxes were not paid because "I didn't have any money" to pay them (id. at 83) and "I'm the cash cow" (id. at 148).

Clayton challenges the temporal nature of the Government's evidence and reiterates the alleged hard times he was enduring. He responds that his house, pool, and collection of "zoo" animals were all purchased years before his tax problems began and thus cannot be the basis of a willful evasion claim. (Doc. 66 at 2.) He makes the same claims as to his vehicles, all of which, except for "inexpensive Dodge vehicles" used by him and his wife, he argues, were purchased in the years before 2003. (Id.) He also contends that the Greenbrier Academy was begun before the medical conditions that necessitated his wife Deborah's "tremendous medical expenses in 2002" (id. at 2-3) and argues that he simply did not have the money to pay his taxes

because of the medical expenses, claiming (without further evidence) that there were more expenses than documented.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials demonstrates that no genuine dispute as to any material fact exists, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The party seeking summary judgment bears the burden of initially demonstrating the absence of a genuine dispute of material fact. Celotex, 477 U.S. at 323. If this burden is met, the non-moving party must then affirmatively demonstrate a genuine dispute of material fact which requires trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless sufficient evidence favoring the non-moving party exists for a fact finder to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 817 (4th Cir. 1995). Moreover, on summary judgment, the non-moving party is entitled "to have the credibility of [its] evidence as forecast assumed, [its] version of all that is in dispute accepted, all internal conflicts in it resolved favorably to [it], the most favorable

of possible alternative inferences from it drawn in [its] behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered." Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979); see Metric/Kvaerner Fayetteville v. Fed. Ins. Co., 403 F.3d 188, 197 (4th Cir. 2005). In a tax case, the debtor's failure to demonstrate that there is no genuine dispute of material fact as to whether a particular debt is dischargeable in bankruptcy is grounds for denying the debtor's motion for summary judgment. See O'Neal v. United States (In re O'Neal), Bankr. No. 08-70577-CMS-7, 2010 WL 3398403, at *14 (Bankr. N.D. Ala. Aug. 26, 2010) (denying a debtor's motion for summary judgment where he failed to demonstrate that no genuine issue of material fact existed as to the Government's claim of nondischargeability under 11 U.S.C. § 523(a)(1)(C)).

**B. General Principles**

A discharge in bankruptcy generally prevents a creditor from pursuing pre-bankruptcy debts against a debtor. Congress, however, has specifically excepted particular debts, including certain federal tax debts, from discharge. United States v. Fegeley (In re Fegeley), 118 F.3d 979, 983 (3d Cir. 1997). Two of those exceptions are significant to this case. First, under 11 U.S.C. § 523(a)(1)(C), a discharge in bankruptcy "does not discharge an individual debtor from any debt for a tax or

customs duty with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."  Second, under 11 U.S.C. §§ 523(a)(1)(A), 507(a)(8), a debtor's bankruptcy does not discharge tax debts arising from tax years where returns for those years are due within three years before the bankruptcy filing.  The Government argues that section 523(a)(1)(C) excepts Clayton's tax debts for tax years 2002 through 2007 from discharge, while section 523(a)(1)(A) operates as an independent and additional exception for tax year 2007.

The Government bears the burden of proving by a preponderance of the evidence that a tax debt is nondischargeable.  Grogan v. Garner, 498 U.S. 279, 286-87 (1991).  This policy promotes the Bankruptcy Code's goal of providing a "fresh start" to the "honest but unfortunate debtor" while recognizing that the Bankruptcy Code does not afford "a completely unencumbered new beginning."  Id.  Exceptions to discharge, meanwhile, are strictly construed in favor of the debtor.  Dalton v. IRS, 77 F.3d 1297, 1301 (10th Cir. 1996). There is authority suggesting that each tax year should be evaluated separately, and so the court will do so here.  Lynch v. United States (In re Lynch), 299 B.R. 62, 83 & n.97 (Bankr. S.D.N.Y. 2003).

### 1.    Section 523(a)(1)(C)

Section 523(a)(1)(C) does not define what constitutes a "willful attempt to evade or defeat a tax," nor does it articulate standards for doing so. Id. at 79. The parties have not cited, nor has the court located, any Fourth Circuit precedent construing section 523(a)(1)(C). Yet over time, other appellate courts have reached a consensus that the willful evasion of tax debts under section 523(a)(1)(C) comprises both a conduct element and a mental state element. In re Birkenstock, 87 F.3d 947, 951 (7th Cir. 1996) ("The plain language of the second part of § 523(a)(1)(C) comprises both a conduct requirement (that the debtor sought 'in any manner to evade or defeat' his tax liability) and a mental state requirement (that the debtor did so 'willfully')."); see also Griffith v. United States (In re Griffith), 206 F.3d 1389, 1396 (11th Cir. 2000) (en banc) (same).

### a.    Conduct Requirement

Section 523(a)(1)(C) "encompasses both acts of commission as well as culpable omissions." Bruner v. United States (In re Bruner), 55 F.3d 195, 200 (5th Cir. 1995). However, a debtor's mere failure to pay his taxes is insufficient proof to establish that he has acted to evade or defeat his taxes. E.g., Haas v. IRS, 48 F.3d 1153, 1158 (11th Cir. 1995), overruled on other grounds, In re Griffith, 206 F.3d 1389. "Rather, nonpayment is

relevant evidence which a court should consider in the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes." _Dalton_, 77 F.3d at 1301.

Thus, nonpayment coupled with the failure to file timely returns, _In re Birkenstock_, 87 F.3d at 952, or the concealment of assets, _In re Bruner_, 55 F.3d at 200, demonstrate the conduct requirement of section 523(a)(1)(C). Other factors found sufficient to meet the conduct element include inadequate recordkeeping, intra-family transfers for insufficient consideration, transfers made in the face of serious financial difficulties, and a lavish or extravagant lifestyle. _Geiger v._ _IRS_ (_In re Geiger_), 408 B.R. 788, 791 (C.D. Ill. 2009); _Hamm v._ _United States_ (_In re Hamm_), 356 B.R. 263, 276-77 (Bankr. S.D. Fla. 2006); _see also_ _Volpe v. IRS_ (_In re Volpe_), 377 B.R. 579, 587 (Bankr. N.D. Ohio 2007) (holding that the IRS proved the conduct element of section 523(a)(1)(C) by showing, among other things, that a debtor failed to pay his taxes "even though he had enough money to pay for non-necessities such as vacations and private school"). Significantly, such acts or omissions are relevant if they took place either during the tax year(s) in which the debtor failed to pay or during later years while the tax obligation remained due. _In re Hamm_, 356 B.R. at 276.

Pertinent here is _In re Lynch_, where the court found that a debtor's payments of discretionary expenses constituted

sufficient affirmative conduct to constitute willful evasion of the payment of tax liabilities. In that case, the debtor had amassed large tax debts because deductions based on her tax shelter investments were disallowed after years of litigation. When the taxes (for the 1980s tax years) came due, the debtor claimed she was unable to pay. In applying section 523(a)(1)(C), the court found that the debtor "knowingly spent several thousand dollars per month on discretionary expenditures that could not reasonably be regarded as essentials, knowing that her tax obligations had to be satisfied, and were unpaid." In re Lynch, 299 B.R. at 77. For example, she continued to pay volitional tithes to her church and made gifts totaling $13,248 a year, bought dinners at restaurants several nights a week, took trips, leased an expensive Manhattan, New York apartment, and paid $6,153 in annual tuition for courses for her occupation. Her credit card averaged $2,486 a month.[6] The court concluded that her conscious choice to make these distributions on nonessential items "is a classic example of the conduct traditionally held to warrant nondischargeability." Id. at 86.

Similarly, in Hawkins v. Franchise Tax Bd., 447 B.R. 291 (N.D. Cal. 2011), the court, relying on In re Lynch, concluded

---

[6] The court found that these outlays were sufficient to meet the conduct element of a willful evasion claim apart from other evidence that the debtor also cancelled a direct deposit of her paycheck to evade the Government's ability to garnish her wages. In re Lynch, 299 B.R. at 76.

that a debtor's extravagant lifestyle, which included the purchase of four vehicles in a family of just two drivers, was sufficient to meet section 523(a)(1)(C)'s conduct requirement where the debtor recognized that he would be unable to satisfy his debts and anticipated that he would be forced to file for bankruptcy. Id. at 302. According to the court, the finding that the debtor "avoided the collection of tax by making unreasonable and unnecessary discretionary expenditures at a time when he knew he owed taxes and knew he would be unable to pay those taxes . . . is sufficient to satisfy the conduct requirement of Section 523(a)(1)(C)." Id. (internal citation and quotation marks omitted).

And in United States v. Jacobs (In re Jacobs), 490 F.3d 913 (11th Cir. 2007), the Eleventh Circuit concluded that section 523(a)(1)(C)'s conduct requirement was "further satisfied by [the debtor's] large discretionary expenditures." Id. at 926. The court concluded that the debtor's large gifts to his children and church, as well as his significant discretionary expenditures on luxury items, expensive automobiles, and golf memberships were a factor in determining the debtor had met the conduct requirement. As the court summarized, "[s]uch large discretionary expenditures, when a taxpayer knows of his or her tax liabilities, is capable of meeting them, but does not, are relevant to § 523(a)(1)(C)'s conduct element." Id.

### b. Mental State Requirement

Section 523(a)(1)(C) also requires that the debtor act willfully in evading or defeating his taxes.  The Government need only demonstrate that the debtor's actions were willful – not that he acted with fraudulent intent.  In re Fegeley, 118 F.3d at 984.  A debtor's actions are willful if his actions are "voluntary, conscious, and intentional."  Toti v. United States (In re Toti), 24 F.3d 806, 809 (6th Cir. 1994).  Thus, to meet the mental state requirement of section 523(a)(1)(C), the Government must prove that the debtor "(1) had a duty to file income tax returns and pay taxes; (2) knew that he had such a duty; and (3) voluntarily and intentionally violated that duty." United States v. Fretz (In re Fretz), 244 F.3d 1323, 1330 (11th Cir. 2001).

The parties agree that the first two components are not at issue in this case.  In his deposition, Clayton admitted that he knew he had a duty to file tax returns and to pay his taxes, as he in fact filed all of his returns.  (Doc. 51-3, at 23, 88-89, 95-96, 108, 111, 114, 142.)  As a result, only the third component – that Clayton voluntarily and intentionally violated that duty – is disputed.

When determining if a debtor voluntarily and intentionally violated his duty to pay taxes, courts traditionally look to "badges of fraud."  See, e.g., United States v. Mitchell (In re

<u>Mitchell</u>), 633 F.3d 1319, 1322 n.4 (11th Cir. 2011). Badges of fraud include: "'(1) the recurrence of the understatement of income for more than one tax year, (2) the understatement of income, (3) implausible or inconsistent explanations of behavior, (4) inadequate records, (5) transfer of assets to a family member, (6) transfer for inadequate consideration, (7) transfer that greatly reduced assets subject to IRS execution, and (8) transfers made in the face of serious financial difficulties.'" <u>Hassan v. United States</u> (<u>In re Hassan</u>), 301 B.R. 614, 620 (S.D. Fla. 2003) (quoting <u>In re Spiwak</u>, 285 B.R. 744, 751 (S.D. Fla. 2002)). However, lavish spending coupled with the knowledge of tax debts is a further indication that a debtor acts willfully in the evasion of his tax obligations. <u>In re Hamm</u>, 356 B.R. at 285-86 (considering a debtor's significant expenditures when determining if a debtor's actions met the mental state requirement of section 523(a)(1)(C)). Indeed, "[a] typical case of non-dischargeable tax liability pursuant to § 523 of the Bankruptcy Code often involves debtors who . . . live a lavish lifestyle they cannot afford . . . while making no effort to satisfy their tax liability." <u>Hawkins</u>, 447 B.R. at 296 (alternations in original) (quoting <u>Rhodes v. United States</u> (<u>In re Rhodes</u>), 356 B.R. 229, 235 (Bankr. M.D. Fla. 2006)).

### c.  Discussion

Clayton argues that despite his success as a lawyer he was a poor businessman, was obligated to spend much of his money on his wife's and daughter's medical expenses, and delegated the handling of tax and financial matters to his wife.  For these reasons, he claims he simply was unaware of where the significant income that he earned went.  On this record, however, the court finds that the Government has demonstrated a genuine dispute of material fact concerning whether Clayton's payments on apparently discretionary items were made with the requisite mental state to evade his income tax obligations.  There is evidence that Clayton was aware of his ongoing income tax obligations and nevertheless spent money on discretionary items.  Indeed, he admitted during his deposition that when he filed his tax returns for 2002 through 2007 (which would have been filed in 2003 through 2008), he was aware that he had not fully paid his federal income taxes at that time.  (Doc. 51-3 at 142.)  Despite his claim that he instructed his wife to make the necessary tax payments (Doc. 51-3 at 82) and "didn't have any money" to pay his taxes (id. 51-3 at 83), he appears to have continued to spend large sums on unnecessary expenditures and luxury purchases and made substantial gifts to charities, his church, and his children.

Significant among these expenditures is the monthly payment of $1,500 Clayton made to his ex-wife, Virginia Clayton, during each tax year in question. (Doc. 51-3 at 39-40.) These were gratuitous payments totaling $18,000 per year that Clayton continued to make in the face of mounting financial burdens and his significant tax debts to the IRS. Courts have held that payments to an ex-wife beyond that required by a marital settlement agreement or court order can serve as proof that a debtor willfully and intentionally sought to avoid his tax obligations. See Schwartz v. United States (In re Schwartz), Bankr. No. 6:03-bk-06007-KSJ, 2009 WL 361383, at *4 (Bankr. M.D. Fla. Jan. 9, 2009). These payments satisfy section 523(a)(1)(C)'s conduct and mental state requirements. Cf. In re Griffith, 206 F.3d at 1396 (concluding that a debtor's intra-family transfers of property for little or no consideration were sufficient to meet section 523(a)(1)(C)'s conduct requirement); see also In re Lynch, 299 B.R. at 75 n.47, 85-86 (concluding that a debtor was not entitled to discharge of her tax debts where she elected to make discretionary expenditures and gifts to charity in lieu of paying her taxes).

There is further evidence that Clayton prioritized his discretionary spending over his income tax obligations. See, e.g., In re Jacobs, 490 F.3d at 927 (indicating that a debtor willfully evades tax payments where he is aware of a legal

responsibility to pay, could have used portions of his income to do so, but "made a conscious decision not to apply the monies [he earned] towards his tax debt" (alteration in original) (quoting Stamper v. United States (In re Gardner), 360 F.3d 551, 561 (6th Cir. 2004))). For example, Clayton testified he made routine gifts of between $100 and $300 per week to his church from 2002 through 2007 (Doc. 51-1 at 151). See In re Lynch, 299 B.R. at 75 (indicating a debtor is not permitted to prioritize payments to his church over his income tax obligations). He also paid tuition and living expenses for several of his children during the tax years in question. Indeed, there is record evidence that, among other education expenses, Clayton paid college tuition and living expenses for a daughter in 2002, a son from 2002 through 2005, and another daughter from 2004 through 2008, thus covering each tax year in question. See In re Volpe, 377 B.R. at 589; United States v. Ryan (In re Ryan), 286 B.R. 141, 156 (Bankr. W.D. Mo. 2002) (finding a "clear-cut case" of willful evasion of taxes where an individual failed to pay taxes for fourteen years, despite paying $30,000 a year in tuition, room, and board so that one of the debtor's children could attend a private university).[7] In addition, Clayton's 2003

---

[7] The Government has proffered evidence that such college and graduate expenses were nonessential. Courts are not uniform as to whether educational expenses should be regarded as necessities, and on this record, because of the presence of several other discretionary payments throughout each tax year, the court need not resolve whether

tax return lists $52,000 in gifts to charities (Doc. 51 at 95-96).  In re Jacobs, 490 F.3d at 926 (noting that donations of $12,152 and $12,000 were relevant to determining nondischargeability under section 523(a)(1)(C)).  Such discretionary outlays belie Clayton's contention that he was simply unable to meet his tax obligations and raise a question for the fact-finder.

In addition to purchasing a 2003 Mercedes-Benz, a luxury vehicle, for his daughter on her 16th birthday, Clayton also spent money on himself.  He purchased a Dodge Ram truck in 2003 and a Dodge Charger in 2005 – both for his personal use.  (Doc. 51-3 at 128.)  His sizeable monthly credit card bills, meanwhile, indicate extensive expenditures on clothes, collectables, tobacco products, and baseball games, among other items.  (Docs. 57-1 through 57-7.)  Such purchases in the face of his unpaid tax obligations are further evidence that Clayton willfully attempted to evade his taxes and create a genuine dispute of fact.  See In re Mitchell, 633 F.3d at 1329 (explaining that a debtor's discretionary spending supports a finding of willful evasion of tax payments).

At oral argument, Clayton directed the court to United States v. Storey, 640 F.3d 739 (6th Cir. 2011), for the

---

any portion of these expenses might in fact qualify as necessities. See In re Lynch, 299 B.R. at 84 n.101.

proposition that mere nonpayment of taxes cannot constitute a basis for denying a debtor discharge of his tax debts. Storey, however, does not advance Clayton's argument. The Storey court concluded that a debtor who simply failed to pay her taxes could not be said to have evaded her tax obligations within the meaning of section 523(a)(1)(C). Id. at 745. Apparently, the debtor's only significant purchase during the tax years in question was a home that was no more lavish that her previous residence, and there was no evidence that she lived extravagantly during that period. Id. The court went on to note that the outcome might have been different had the debtor made significant purchases after she ceased making her tax payments or "chose[n] to engage in recreational or philanthropic activities instead of paying her taxes." Id.

Here, by contrast, there is evidence that Clayton chose to engage in recreational and philanthropic activities instead of paying his taxes. There is also evidence he engaged in significant purchases and made substantial gifts after he became aware of his tax debts. On this record, in contrast to Storey, the Government has demonstrated sufficient facts to indicate that Clayton was engaged in more than mere nonpayment of his tax obligations.

Clayton finally argues that he is entitled to summary judgment as to claims for tax year 2002 because there is no

evidence that he knew until 2003 that he was in arrears for his 2002 tax payments. Assuming this to be factually true, Clayton overlooks the fact that there is evidence that when his 2002 tax liability came due in 2003 and thereafter, he continued to purposefully spend on needless items in lieu of paying his previous tax year liability. Therefore, the court declines to grant him summary judgment on this record. See Hamm, 356 B.R. at 276 (noting that acts and omissions of willful evasion occurring in later tax years are relevant if the prior years' taxes remained unpaid).

### d. Conclusion

The Government has demonstrated record evidence sufficient to show that Clayton had an obligation to pay income taxes, knew of that duty, and while making an extraordinary income willfully evaded that duty by knowingly prioritizing discretionary expenditures over his income tax obligations. If such evidence were to be believed, and depending on the credibility attributed to Clayton's testimony, there is evidence upon which a fact-finder could conclude that Clayton was not the type of "honest but unfortunate debtor" contemplated by the Bankruptcy Code who is entitled to discharge his tax debts. Accordingly, his motion for summary judgment will be denied.

**2.   Section 523(a)(1)(A)**

Another discharge exception applicable to certain tax debts is section 523(a)(1)(A).  It excepts from discharge "any debt for a tax or customs duty of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) . . ., whether or not a claim for such tax was filed or allowed."  11 U.S.C. § 523(a)(1)(A).  Section 507(a)(8) specifically lists "unsecured claims of governmental units . . . for a tax on or measured by income or gross receipts for a taxable year ending on or before the date of the filing of the [bankruptcy] petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition."  11 U.S.C. § 507(a)(8)(A)(i).  Simply put, tax debts that arise from tax returns that are due within three years before a debtor's bankruptcy filing are excepted from discharge in bankruptcy. Range v. United States, 245 B.R. 266, 269 n.1 (S.D. Tex. 1999) ("Tax for which a return was required to be filed within three years preceding bankruptcy or after bankruptcy . . . is income tax entitled to priority and therefore, not discharged.").  The Government contends that section 523(a)(1)(A)'s exception applies to Clayton's tax debts for tax year 2007.

Clayton does not raise a substantive response to the Government's argument,[8] but the application of section 523(a)(1)(A) to tax year 2007 is straightforward. See Waugh v. IRS (In re Waugh), 109 F.3d 489, 491 (8th Cir. 1997) (noting that the application of section 523(a)(1)(A) is ordinarily a "relatively simple process"). It is undisputed that the Government's tax claims against Clayton were unsecured and that Clayton's taxes are measured as a percentage of his income. The only question of law, therefore, is whether section 523(a)(1)(A)'s three-year look-back period applies to Clayton's 2007 tax debts. See Fontes v. United States (In re Fontes), 228 B.R. 3, 7 (Bankr. N.D. Ala. 1998) (noting that section 523(a)(1)(A) limits dischargeability to unpaid taxes due within three years of a bankruptcy filing).

Applying section 523(a)(1)(A) to the facts in the record, the court finds that the Government has demonstrated a prima facie case of a claim under section 523(a)(1)(A)'s three-year look-back provision to Clayton's 2007 taxes. While the Government has not submitted evidence on when Clayton's various tax obligations became due, the court takes judicial notice that federal income taxes for calendar year 2007 became due no sooner

---

[8] Clayton objects to the Government's section 523(a)(1)(A) claim on the grounds it is not specifically referenced in the complaint or amended complaint. As the court noted in its prior ruling, the complaint clearly raised sufficient facts to support this claim that has a straightforward application. See Clayton, 2011 WL 6180033, at *7 n.7.

than April 15, 2008, see Lord v. Comm'r, 525 F.2d 741, 744 (9th Cir. 1975) (taking judicial notice that a taxpayer's 1961 tax return did not have to be filed until April 15, 1962 (citing 26 U.S.C. § 6072)), and, thus, dischargeable only in a bankruptcy petition filed after April 15, 2011, see, e.g., In re Waugh, 109 F.3d at 491 (explaining that a debtor's income taxes for 1987 became due on April 15, 1988 and, therefore, would have become dischargeable in a bankruptcy occurring after April 15, 1991); see also United States v. Acker (In re Acker), Bankr. No. 09-41961, 2010 WL 3547221, at *5 (Bankr. E.D. Tex. Sept. 7, 2010) (explaining that a debtor's tax obligations for tax year 2006 became due on April 15, 2007, which was within three years of the bankruptcy petition, and, thus, were nondischargeable). Clayton filed for Chapter 7 bankruptcy protection on May 22, 2010. (Doc 13; Doc. 44 at 2.) As a result, Clayton's tax obligations for tax year 2007 were nondischargeable in his 2010 bankruptcy petition. At the very least, this record contains sufficient evidence to indicate that the Government has raised a genuine dispute of material fact as to whether section 523(a)(1)(A) should render Clayton's tax debts for tax year 2007 non-dischargeable. Accordingly, Clayton's motion for summary judgment, at least as to tax year 2007, will be denied on that basis as well.

## III. CONCLUSION

For the reasons set forth above, therefore,

The court finds that a genuine dispute of material fact exists for trial.  Clayton's motion for summary judgment (Doc. 51) is DENIED.

                              /s/   Thomas D. Schroeder
                              United States District Judge

January 6, 2012